1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  ELIZABETH FIELDER                        CASE NO. C11-1688RSM

11              Plaintiff,                    ORDER ON MOTION TO DISMISS
                                             AND MOTION FOR ATTORNEY
12                                           FEES, COSTS, AND STATUTORY
          v.                                 PENALTY
13
    STERLING PARK HOMEOWNERS
14  ASSOCIATION ET AL.

15              Defendants.

16

17                    **I.      INTRODUCTION**

18          This matter comes before the Court on individual Defendants Waverly Hagen and Don

19  Shoemaker's motion to dismiss and motion for attorney fees, costs, and statutory penalty. Dkt. #

20  14.  Plaintiff Elizabeth Fielder brought suit against the Sterling Park Homeowners Association

21  ("SPHA") and individual members of the SPHA for violations of the Fair Housing Act (FHA),

22  42 U.S.C. §§ 1981, 1982, the Washington Law Against Discrimination (WLAD), and state-law

23  torts arising from the SPHA's campaign to close Ms. Fielder's in-home daycare.  Defendants

24  Hagen and Shoemaker bring the Rule 12(b)(6) motion to dismiss on the basis that as individual

1  board members of the SPHA, they are immune from this suit.  Defendants also bring a special

2  motion to strike pursuant to Washington's anti-SLAPP statute.  The Court heard oral argument

3  on October 31, 2012. For the reasons that follow, the motions are DENIED.

## II. BACKGROUND

5      Ms. Fielder is one of two African-American residents in the Sterling Park community.

6  She moved into her home in 1997 and opened a daycare in 1998.  SPHA's Covenants,

7  Conditions, and Restrictions (CCRs) contained a no-commercial-business clause (Section 3.6).

8  However, in 1993, the Board adopted an "invisibility clause" that permitted "invisible" home-

9  based businesses within Sterling Park.  The invisibility clause was not passed by the requisite

10  majority, but the Board adopted the clause as a "guideline" for the Board's use. Dkt. # 10.

11      Before opening her daycare, Ms. Fielder asked permission from the SPHA's then

12  president, Cathy Lehman.  Lehman told Ms. Fielder that there was no problem with her operating

13  a daycare from her house so long as she "didn't paint the house purple, or have broken down cars

14  in front of the house." *Id.* at ¶ 4.1.6.  Ms. Fielder received the proper state licensing to open her

15  business and the daycare operated until 2009 without incident.  She often cared for the children

16  of families within Sterling Park, including SPHA board members.

17      By 2009, the state permitted up to twelve children in the daycare.  In the fall of 2009 Ms.

18  Fielder had about six children in her daycare from three different families.  Ms. Fielder's house

19  is in a cul-de-sac, and parents would generally drop and pick-up children between 7 a.m. and

20  5:30 p.m.  Ms. Fielder often drove the children to and from school in her SUV. In October of

21  2009, Ms. Fielder cared for three children whose parents worked a "non-regular" shift, with

22  pick-up and drop-off occurring between 4:30 and 9:00 p.m.

23

24

## A. The Neighbors' Actions

In mid-July 2009, Ms. Fielder began caring for Christina Singleton and DeMarco Kelly's child.  The parents are African American and Christina is a Muslim.  Christina wore a head scarf and non-Western clothing when she went to Ms. Fielder's home to pick up her child.  Several neighbors began coming outside their homes to watch Christina.  One neighbor approached the car with a notepad and paper and appeared to be writing down information about the couple and their vehicle.  This behavior eventually extended to other of Ms. Fielder's clients.  Ms. Van Bramer and Mr. Shoemaker were often seen congregating and staring; blocking access to the cul-de-sac and forcing clients to drive around them; photographing the clients and children; and yelling baseless complaints at clients including to "turn off the radio" when the radio was not in fact on.  Ms. Van Bramer accused a parent of leaving a child in the car while it was running; Ms. Fielder witnessed Van Bramer yelling "fuck off" while vulgarly gesturing.  Ms. Van Bramer and Ms. Hagen's sons hit golf balls at Ms. Fielder's home.  Ms. Singleton and Mr. Kelly stopped using Ms. Fielder's daycare because of the harassing behavior of the neighbors.

## B. The Board's Actions

On October 19, 2009, SPHA held its monthly meeting at the home of two Board members, the Warnocks.  At the meeting, the Board addressed a "homeowner complaint" about Ms. Fielder's daycare.  The complaint alleged excessive noise, twelve children present on any given day and left outside in the summer, a barking dog, traffic and noise from 4:30 a.m. to 10 p.m., speeding cars, and irregular parking.  Ms. Fielder was never notified about any such complaint.  At a November 30, 2009 board meeting, the Board drafted a letter outlining the concerns.  In January of 2010, the Board finalized a letter and sent it to three home businesses within Sterling Park.  Letters were sent to Ms. Fielder, another home with a daycare (Ms. Ronning), and a home with a salon (Ms. Atkins).  The January 31, 2010 letter was the first time

1  that Ms. Fielder was apprised of any complaints against her daycare.  This letter requested

2  information about the operation of each business.  It directed the recipients to review the

3  language of Section 3.6 of the CCRs and the "invisibility clause."

4         On February 5, 2010, Ms. Fielder sent a notice to her clients reiterating that clients must

5  obey traffic rules and be courteous about noise.  Ms. Fielder wrote a responsive letter to Ms.

6  Hagen addressing the Board's concerns.  She offered to share her business records and "to work

7  with the board with the expectation that [she] be treated fairly." Dkt. # 10, ¶ 4.2.17.  She

8  attempted to give the letter to Ms. Hagen at her home.  Ms. Hagen escorted Ms. Fielder off her

9  property and onto the sidewalk before accepting the letter.

10        The other daycare operator responded to the Board on February 12, 2010, that she

11 provided occasional daycare and had family and friends visit between the hours of 9-4.  The

12 salon operator replied, on some unknown date, that she worked two to three days per week, with

13 9-5 hours, and that she saw about five to eight people per day during the week and fewer on

14 Saturdays.  On April 5, 2010, the Board sent a letter of non-compliance to Ms. Fielder only.

15        Ms. Fielder's son, Leon Richardson, attended an April 22, 2010 Board meeting to discuss

16 the complaints against Ms. Fielder's business.  Mr. Richardson made the point that the

17 complaints were unfounded, and requested information about how the Board defined the

18 invisibility clause.  The Board stated that it would disregard all of the complaints aside from the

19 excess traffic; however, it provided no guidance on how to interpret the invisibility clause.  After

20 the meeting, Mr. Richardson sent an email to Ms. Hagen describing the hours and number of

21 vehicles per day.  He wrote that between 6 and 10 a.m. there could be anywhere from four to six

22 vehicles, and the same between 2:15 and 7 p.m.  Ms. Fielder attended the next Board meeting in

23 May to discuss the complaints.  The complainants were identified as Ms. Van Bramer and Mr.

24

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY
PENALTY - 4

Shoemaker.  The Board suggested that Ms. Fielder talk to the complainants to resolve the issue.

Ultimately, the complainants refused to speak with Ms. Fielder and she received a letter on June

7, 2010, directing her to close her daycare.

One month later, Ms. Fielder filed a complaint with the Department of Housing and

Urban Development ("HUD") and the Washington State Human Rights Commission ("HRC").

In February 2011, she withdrew the HRC complaint and re-filed it with the King County Office

of Human Rights ("OCR").  OCR notified SPHA that at least ten registered businesses were

operating from homes within Sterling Park.  OCR ultimately issued a finding of cause as to racial

discrimination based on disparate treatment.

On May 26, 2011, The Board sent the following email to the other daycare operator, Ms.

Ronning:

> You may or may not be aware that the SPHA Board has requested a
> homeowner who is operating a business out of a home in Sterling Park to
> either close the business or relocate it out of the neighborhood. . . . The
> homeowner subsequently filed a fair housing complaint with HUD . . .
> against the Sterling Park Homeowners' Association claiming that the
> Board selectively enforced the CC&R by only requesting one business to
> close and allowing others to continue operating. The investigation is due
> to conclude very soon. Our lawyer has advised us that, since the intent of
> our CC&R is clear (i.e. no business of any kind under any circumstances
> regardless of any "invisibility" interpretation), we must immediately send
> similar requests to close to any other businesses believed to be operating
> in Sterling Park. As such, you will be receiving a letter from the SPHA
> Board stating you are believed to be not in compliance with CC&R 3.6
> pertaining to business in the home. We are sending this advance notice as
> a courtesy to you.

Dkt. # 10, ¶ 4.2.40. Letters to Ronning and Atkins were sent the following day stating that their

properties were not in compliance.  The letters did not say that the businesses must be

immediately closed or relocated.

1    On October 10, 2011, the Board announced that members voted to change the CCRs to

2    permit businesses under Section 3.6 with certain limitations.  Subsection (h) requires that "The

3    business must not include more than four persons per day coming to the subject property for

4    goods or services with hours of operation limited from 7 a.m. to 6 p.m." *Id.* at ¶ 4.2.44. Under

5    the new CCR provision, Ms. Fielder is still not in compliance and the SPHA maintains that she

6    must close or relocate.

7                                    **III. ANALYSIS**

8    **A.  Motion to Dismiss**

9    In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether the

10   plaintiff has alleged sufficient facts to state a claim for relief which is "plausible on its face."

11   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

12   544, 570 (2007)).  A claim is facially plausible if the plaintiff has pled "factual content that

13   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

14   alleged."  *Id.* (citing *Twombly,* 550 U.S. 556).  In making this assessment, the Court accepts all

15   facts alleged in the complaint as true, and makes all inferences in the light most favorable to the

16   non-moving party.  *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009)

17   (internal citations omitted); *Fajardo v. County of Los Angeles,* 179 F.3d 698, 699 (9th Cir.1999).

18   The Court is not, however, bound to accept the plaintiff's legal conclusions.  *Iqbal*, 556 U.S. at

19   678.  While detailed factual allegations are not necessary, the plaintiff must provide more than

20   "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."

21   *Twombly*, 550 U.S. at 555.

22   Defendants contend that Shoemaker and Hagen are shielded from personal liability under

23   the Washington Nonprofit Corporation Act (RCW 4.24.264), are protected under the Business

24

1  Judgment Rule ("BJR"), and that plaintiff cannot reach defendants through piercing the

2  corporate veil or for *ultra vires* acts.  Plaintiff responds that her federal claims preempt

3  application of the Washington statute and that she has pled sufficient facts to support individual

4  liability for civil rights and housing discrimination claims.[1]

5    1.  Director Immunity

6      Plaintiff asserts federal claims for violations of 28 U.S.C. §§ 1981 and 1982, and the

7  FHA.  Defendants contend that Shoemaker and Hagen are immune from individual liability as

8  directors of the SPHA.[2]  For such claims, courts have found that directors who participate in,

9  authorize, or ratify the commission of a civil rights or fair housing tort may be held individually

10 liable. *See Smith v. Setchel*, 510 F.2d 1162, 1163 (9th Cir. 1975) (reinstating §§ 1981, 1982, and

11 FHA § 3617 claims against the corporate entity and two individuals—the apartment complex

12 owner and his employee); *Tillman v. Wheaton-Haven Recreation Assoc.*, 517 F.2d 1141, 1146

13 (4th Cir. 1975) (finding directors of a non-profit swimming pool association could be held

14 personally liable if they intentionally caused the corporation "to infringe the rights secured by §

15 1981").  To successfully plead a §§ 1981 or 1982 claim against individual directors, a plaintiff

16 must allege that the directors were personally involved in the discrimination. *See Bruin v. Mills*

17 *College*, 2007 WL 419783, * 3-4 (N.D. Cal. Feb. 6, 2007).  For an FHA violation, at least one

18 court has held that a claim may be maintained against individual directors even where

19 _____

20    [1] Defendants' motion to dismiss argued for dismissal based only on directorship
   immunity. Although other grounds for dismissal were improperly argued in the Reply brief and
21 at oral argument, the Court considers only the directorship liability arguments made in
   Defendants' motion.
22    [2] Defendants brought the motion on the basis that both Shoemaker and Hagen are
   directors of the SPHA's board. Defendants later stated that Mr. Shoemaker is not a director, but
23 merely a member at large. Again, the Court considers only director immunity as the basis for
   considering Defendants' motion to dismiss and leaves the factual issue of Shoemaker's SPHA
24 responsibilities for the parties to address at a later time.

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY
PENALTY - 7

1   defendants' acts lack discriminatory intent. *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347,

2   1365 (D. Haw. 1995) ("a corporation's officers and directors may be held individually liable for

3   their failure to ensure the corporation's compliance. . . . This is so even where the individual

4   director or officer did not actively participate in the alleged discrimination and did not

5   subjectively intend to discriminate against the complainant.") (internal citations omitted).  As

6   discussed below, Plaintiff pleads facts sufficient to infer that both Hagen and Shoemaker were

7   personally involved in the alleged discrimination and that they acted with discriminatory intent.

8          Plaintiff also asserts claims under the WLAD and for state-law torts including tortious

9   interference with a business.  The SPHA is a nonprofit Washington corporation. Under RCW

10  4.24.264(1), directors of a nonprofit corporation cannot be held individually liable for

11  discretionary decisions unless the decision constitutes gross negligence.  Gross negligence is

12  defined as a "failure to exercise slight care." WPI 10.07.  Whether Defendants can be held

13  individually liable depends on whether the Board's disparate enforcement of the CCRs against

14  Ms. Fielder amounts to gross negligence.

15         Corporations are entitled to a strong presumption that directors are acting in the best

16  interest of the corporation.  But the plain language of RCW 4.24.264(1) is clear: if a Director's

17  decision constitutes gross negligence, the Director can be held personally liable.  Only one

18  Washington case discusses individual liability under RCW 4.24.264. In *Eastwood v. Horse*

19  *Harbor Foundation, Inc.*, 170 Wn.2d 380 (2010), the Washington Supreme Court briefly

20  addressed nonprofit directorship liability.  It found that directors may be individually liable for

21  torts where the degree of care exercised is substantially greater than ordinary negligence. *Id.* at

22  401.  Because there is limited analysis for nonprofit directorship liability in Washington,

23

24

1   Defendants contend that the Business Judgment Rule provides additional support to insulate

2   Defendants from liability.

3        The BJR presumes that corporate officers are acting in the best interest of the

4   corporation.  The Rule "immunizes management from liability in a corporate transaction

5   undertaken within both the power of the corporation and the authority of management where

6   there is a reasonable basis to indicate that the transaction was made in good faith." *Schwarzmann*

7   *v. Ass'n of Apartment Owners of Bridgehaven*, 33 Wash. App. 397, 402, 655 P.2d 1177, 1180

8   (1982).  Courts are reluctant to substitute judgment for that of corporate directors. *Id.*  But

9   directors are not immunized from liability when they fail to exercise proper care, skill, and

10   diligence. *Shinn v. Thrust IV, Inc.*, 56 Wash. App. 827, 834-35, 786 P.2d 285, 290 (1990).

11        The Court finds Defendants' director immunity arguments without merit.  For her federal

12   claims, Plaintiff alleges facts sufficient to infer that the board members (1) disparately enforced

13   the CCRs, (2) intentionally discriminated against Ms. Fiedler based on race, and (3) were

14   personally involved in the disparate enforcement.   Similarly, for her state claims, the facts

15   alleged are sufficient to infer that the board members acted with gross negligence and improper

16   motive.

17        First, Ms. Fielder alleges facts that show that the SPHA enforced the CCRs disparately

18   against her.  Ms. Fielder was asked to close or relocate while no other business received that

19   treatment.  The Board cited the "invisibility clause" as the basis for disparate enforcement, but

20   the Board never articulated any standards by which the clause could be interpreted, nor was the

21   clause ever passed as a valid amendment to the CCR.  Moreover, the Board permitted Ms.

22   Fielder's daycare for almost twelve years without incident.  Thus, it appears the CCRs were

23   disparately enforced.

24

1    Second, Ms. Fielder alleges facts that permit an inference of intentional discrimination

2    against her.  Although Ms. Fielder alleges that Ms. Singleton's presence at her home triggered

3    the cascade of events and that the neighbors began harassing behavior because of Ms.

4    Singleton's racial and religious status, the complaint asserts that neighbors harassed Ms.

5    Fielder's clients, refused to discuss complaints with Ms. Fielder personally, and targeted her

6    business while permitting numerous other businesses run by white community members.

7    Additionally, the OCR independently found that there was reasonable cause to believe the SPHA

8    engaged in an unfair housing practice due to Ms. Fielder's race. Dkt. # 10, ¶ 4.2.42.  Even if Ms.

9    Singleton's presence triggered the neighbors' conduct, there are probative facts pleaded in the

10   complaint that permit an inference of intentional discrimination against Ms. Fielder.

11   Third, as for Hagen and Shoemaker's personal involvement, Ms. Fielder states that Ms.

12   Hagen was the president of the SPHA; that she signed and sent the letter to Ms. Fielder

13   demanding the closure or relocation of the daycare because of a violation of the CCRs; that she

14   refused to allow Ms. Fielder onto her property when Ms. Fielder attempted to give her a letter;

15   and that she permitted other white businesses to persist, relying only on the say so of those

16   business owners about customer density and traffic.  Likewise, Ms. Fielder alleges that

17   Shoemaker was a member of the Board, harassed her daycare clients, and complained to the

18   Board about her business.  Plaintiff's allegations show that both Hagen and Shoemaker were

19   personally involved in the disparate treatment.

20   Taking Plaintiff's allegations as true, the Court has no trouble finding that the board

21   member's actions could constitute gross negligence.  For example, violations of the WLAD can

22   never be made in good faith. RCW 49.60.010 ("discrimination threatens not only the rights and

23   proper privileges of its inhabitants but menaces the institutions and foundation of a free

24

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY
PENALTY - 10

1    democratic state"). Additionally, the BJR is not absolute defense to unlawful discrimination.

2    *E.E.O.C. v. Yenkin–Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir.1997) ("Although it is true

3    that a factfinder should refrain from probing an employer's business judgment, a decision to

4    terminate an employee based upon unlawful considerations does not become legitimate because

5    it can be characterized as a business decision."). Acts of purposeful discrimination go well

6    beyond ordinary negligence. It may be the case that the Plaintiff will be unable to demonstrate

7    purposeful discrimination after discovery, but she has at least alleged a plausible inference that

8    the Board disparately enforced the CCRs against her based on her race.

9         Defendants cite *Schwarzmann* for support that the BJR insulates the individual board

10   members from liability. *Schwarzmann* concerned condo owners with a leaky ceiling. 33 Wash.

11   App. at 399. The plaintiffs complained to the condo association board, which failed to provide

12   sufficient corrective action. *Id.* at 400. Plaintiffs filed suit against the board and its individual

13   members. *Id.* The appellate court upheld dismissal of the individual board members, stating that

14   the board member's acts fell within the BJR. *Id.* at 401. It noted that absent evidence of bad faith

15   or improper motive, the court cannot second-guess actions taken by individual members acting

16   on behalf of the corporation. *Id.* at 403.

17        *Schwarzmann* is inapposite. Plaintiff alleges rights violations derived from race-based

18   disparate treatment. Plaintiffs' allegations against the board members are quintessentially based

19   upon improper motive. Moreover, plaintiffs may challenge whether business decisions "were so

20   infected with error that defendant could not have honestly relied upon it." *Bender v. Hecht's*

21   *Dept. Stores*, 455 F.3d 612, 627 (6th Cir. 2006). Here, plaintiff pleads facts probative of pretext.

22   Besides the events leading up to the Board's demand that Ms. Fielder close or relocate, the Board

23   sent the "courtesy letter" to other home businesses, as instructed by SPHA's lawyer after Ms.

24

1    Fielder filed her HUD complaint. That letter at least suggests that the Board's decision to enforce

2    the CCRs against only Ms. Fielder lacked legitimacy.  Thus, because plaintiff alleges sufficient

3    factual allegations in the complaint to support keeping Mr. Shoemaker and Ms. Hagen in the suit

4    for both the federal and state claims, the Court denies the 12(b)(6) motion.[3]

5    **B.  Motion for Attorney Fees, Costs, and Statutory Penalty**

6          Within the motion to dismiss, Defendants brought a motion for attorney fees, costs, and

7    statutory penalty against Plaintiff.  They contend that to the extent Plaintiff seeks to hold Mr.

8    Shoemaker personally liable, her complaint runs afoul of Washington's anti-SLAPP statutes.

9          The Washington anti-SLAPP Act is intended to address lawsuits brought primarily to

10   chill the valid exercise of the constitutional rights of free speech and petition for redress.  The

11   legislature found that it is in the public interest for citizens to participate in matters of public

12   concern, and to provide information on public issues that affect them without fear of reprisal

13   through abuse of the judicial process. RCW 4.24.525; Senate Bill 6395, Laws of 2010, Ch. 118 §

14   1.

15         The law provides, in relevant part, that "[a] party may bring a special motion to strike any

16   claim that is based on an action involving public participation" as defined in the statute. RCW

17   4.24.525(a).  The section applies to "any claim, however characterized, that is based on an action

18   involving public participation and petition." RCW 4.24.525(2).  An action involving public

19   participation includes "[a]ny oral statement made . . . in a place open to the public or a public

20   forum in connection with an issue of public concern . . ." RCW 4.24.525(2)(d) and (e).

21

22   _____

23         [3] Because the Court rejects Defendants' argument for director immunity based on the
     pleading standard for federal civil rights claims, RCW 4.24.264, and the Business Judgment
     Rule, it finds discussion of the piercing the corporate veil and ultra vires doctrines unnecessary.

24

1    The anti-SLAPP law provides relief to a defendant which is in the nature of immunity

2    from suit. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (addressing California's anti-

3    SLAPP statute).  In passing the law, the Washington legislature noted concern regarding both the

4    chilling effect on the valid exercise of the constitutional right of freedom of speech, and the

5    chilling effect of "the costs associated with defending such suits." RCW 4.24.525, notes 2010

6    Ch. 118.  The statute accordingly provides for an award of attorney's fees and costs, plus a

7    statutory award of $10,000.00, to a defendant who prevails on an anti-SLAPP motion. RCW

8    4.24.525(6)(a)(i) and (ii).  Conversely, if the court finds that the anti-SLAPP motion to strike

9    was frivolous or brought solely to cause unnecessary delay, then costs, attorney's fees, and

10   $10,000.00 shall be awarded to the plaintiff. RCW 4.24.525(6)(b)(i) and (ii). Therefore, the

11   special motion is not without risk to the moving party.

12        To prevail on a special motion to strike, the defendant must show by a preponderance of

13   the evidence that the plaintiff's claim is based on an action of public participation and petition.

14   RCW 4.24.525(4)(b).  If this burden is met, the burden shifts to the plaintiff to establish by clear

15   and convincing evidence, a probability of prevailing on the claim. *Id.*  Here, Shoemaker argues

16   that to the extent Plaintiff seeks to impose personal liability, Plaintiff's claims against him are

17   improperly based on his comments to the SPHA and his acts to "gather evidence . . . in order to

18   report it to the proper authority." Dkt. # 14, p. 15.  He contends such acts and comments are

19   actions of public participation within the meaning of the statute and that the complaint seeks to

20   chill his protected First Amendment rights.

21        Plaintiff opposes the motion on five grounds: (1) the motion to strike is untimely, (2) as

22   to the federal claims, the defendant's motion is preempted, (3) Plaintiff's first amendment rights

23   under the *Noerr Pennington* doctrine insulate plaintiff from liability imposed by the statute, (4)

24

1   Defendants fail to meet the statutory criteria, and (5) Plaintiff offers clear and convincing

2   evidence demonstrating a prima facie case.  Although Defendants' motion suffers from several

3   defects, the Court addresses Plaintiff's arguments for timeliness, preemption, and failure to meet

4   the statutory criteria.  As discussion of those arguments is dispositive, the Court declines to

5   address Plaintiff's formulation of the *Noerr Pennington* doctrine.

6      1.  <u>Timeliness</u>

7      RCW 4.24.525(5)(a) provides that "[t]he special motion to strike may be filed within

8   sixty days of the service of the most recent complaint or, in the court's discretion, at any later

9   time upon terms it deems proper."  Plaintiff filed her amended complaint on October 25, 2011.

10   Defendants brought the special motion to strike on March 5, 2012, much later than the sixty day

11   service requirement without leave of the Court.  Defendants offered no particular reason why the

12   motion was untimely, but directed the Court to case law where courts permitted late filing,

13   particularly in cases where discovery has yet to begin. *See Phoenix Trading, Inc.*, 2011 WL

14   3158416 * 6 (W.D. Wash. July 25, 2011) (noting that the language of RCW 4.24.525(5)(a) is

15   permissive). Despite Defendants' noticeable lack of excuse as to timeliness, the Court declines to

16   decide the motion on a purely procedural deficiency.

17      2.  <u>Preemption</u>

18      Defendants generically attack Plaintiff's claims without specifying the particular claims to

19   which the anti-SLAPP statute applies.  Plaintiff correctly argues that anti-SLAPP statutes are not

20   applicable to federal claims.  In the Ninth Circuit, federal preemption is well established in the

21   anti-SLAPP context.  For example, in *Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*,

22   448 F. Supp. 2d 1172 (C.D. Cal. 2006), the court thoroughly discussed federal preemption of

23   California's anti-SLAPP statute and found the statute inapplicable to federal claims.  The court

24   noted that "California has no interest in dictating rules of procedure or substance applicable to

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY
PENALTY - 14

1   federal claims brought in federal court."[4] *Id.* at 1182; *see also In re Bah*, 321 B.R. 41, 46 (9th

2   Cir. BAP 2005) (agreeing that the "anti-SLAPP statute may not be applied to matters involving

3   federal questions").  Defendants offer no substantive challenge to the argument that the

4   Supremacy Clause preempts application of Washington's anti-SLAPP statute to Plaintiffs' §§

5   1981, 1982, and FHA claims.  Accordingly the motion is denied for Plaintiff's federal claims.

6       3.  Merits of Defendants' Motion

7           In bringing the special motion to strike under the anti-SLAPP statute, Defendants must

8   show, by a preponderance of the evidence, that *the claim* is based on an action involving public

9   participation and petition.  *Phoenix Trading, Inc. v. Kayser*, 2011 WL 3158416 * 5 (W.D. Wash.

10  July 25, 2011) (emphasis added).  When evaluating whether the moving party meets its threshold

11  burden, courts look to the "principle thrust or gravamen of the plaintiff's cause of action."

12  *Bautista v. Hunt & Henriques*, C-11-4010 JCS, 2012 WL 160252 (N.D. Cal. Jan. 17, 2012)

13  (quoting *Martinez v. Metabolife Internat. Inc.,* 113 Cal. App. 4th 181, 187, 6 Cal. Rptr. 3d 494

14  (2003)).  In addition, the moving party must demonstrate that "the actual acts underlying each

15  claim at issue were acts taken [by the defendant] in furtherance of the right to petition and free

16  speech."  *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1017

17  (N.D. Cal. 2007).  If a court denies an anti-SLAPP motion, it has merely found that the plaintiff's

18  claims may have merit; the court does not evaluate whether plaintiff's claim will succeed. *Batzel*

19  *v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).

20  _____

21      [4] The Court looked to relevant California case law in instances where Washington law
    remains limited on a number of issues. Because Washington's new anti-SLAPP statute mirrors
22  California's Anti-SLAPP Act, this Court has previously cited to California case law for
    persuasive authority. *See Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1110
23  (W.D. Wash. 2010).

24

1    Here, Plaintiff asserts a state law claim for tortuous interference with a business.[5] Dkt. #

2    10, ¶ 5.3.  As noted above, Defendants failed to articulate why any of plaintiff's individual

3    claims are based on an action involving public participation and petition.  Instead, they assert

4    generally that, as to all claims, Plaintiff's complaint is impermissibly based on Shoemaker's

5    statements to the SPHA.  Defendants' motion is devoid of any particular discussion about how

6    Plaintiff's tortious inference claim is based on Shoemaker's comments.  It is Defendants' burden

7    to show first that each claim is based on an action involving public participation and they have

8    failed to do so here. *See Sonoma Foods, Inc.*, 634 F. Supp. 2d at 1017 (denying an anti-SLAPP

9    motion where it generally targeted the complaint as a whole).  But even if Defendants had

10    offered support for why the anti-SLAPP statute applies to Plaintiff's discrete claims, the motion

11    still fails to show that the gravamen of Plaintiff's complaint targets Shoemaker's actions or that

12    Shoemaker's actions are protected acts of public participation under the statute.

13    First, Plaintiff's complaint provides detailed factual allegations of disparate treatment and

14    harassment by her neighbors.  Although Shoemaker and Van Bramer's initial neighbor complaint

15    to the SPHA Board may have precipitated the Board's consideration of Ms. Fielder's business,

16    the statement by Shoemaker hardly encompasses the thrust of Plaintiff's allegations against him.

17    Plaintiff alleges that Shoemaker blocked her client's entry and exit, stood around and laughed

18    while clients dropped their children off, yelled baseless complaints at clients as they drove in and

19    out of the cul-de-sac, and wrote down information about clients and their vehicles.  Plaintiff also

20

21

---

22    [5] It is unclear from the Amended Complaint whether Plaintiff alleges any additional state
23    law causes of action. To the extent she does, the analysis applies equally to any additional claims
      as Defendants have not shown that each claim is independently based on Shoemaker's right of
24    public participation.

1    alleges that she lost clients because they no longer felt comfortable dropping their children off

2    due to her neighbors' actions.

3         "[C]ourts evaluating a special motion to strike . . . must carefully consider whether the

4    moving party's conduct falls within the "heartland" of First Amendment activities." *Jones v. City*

5    *of Yakima Police Dept.*, 12-CV-3005-TOR, 2012 WL 1899228 (E.D. Wash. May 24, 2012).  The

6    conduct alleged in the complaint predominately describes unprotected activity.  The First

7    Amendment does not protect neighbors from acting badly to each other.  Assuming for the

8    moment that Shoemaker's comments to the board were protected speech, the complaint as a

9    whole targets Shoemaker's actions more broadly.  "When the allegations referring to arguably

10   protected activity are only incidental to a cause of action based essentially on nonprotected

11   activity, collateral allusions to protected activity should not subject the cause of action to the

12   anti-SLAPP statute." *Martinez v. Metabolife Internat. Inc.,* 113 Cal. App. 4th 181, 187, 6 Cal.

13   Rptr. 3d 494 (2003).  Defendants contend that Shoemaker's actions were investigative activities

14   and liken Shoemaker's conduct to a person who does "nothing more than detail his version of the

15   facts to a police agency and asks the agency for assistance . . . ." Dkt. # 14, p. 14.  However, such

16   a construction of the facts is improper.  Taking Plaintiff's allegation in the light most favorable

17   to her, as the Court must, the claims only tangentially implicate Mr. Shoemaker's comments to

18   the Board and the complaint does not target protected activity as intended by the statute.

19        Second, Defendants also fail to demonstrate that Shoemaker's comments to the SPHA

20   fall under the protection of the anti-SLAPP statute as acts of public participation.  Under

21   subsections (a), (d), and (e), an act of public participation includes "[a]ny oral statement made, or

22   written statement or other document submitted, in a legislative, executive, or judicial proceeding

23   or other governmental proceeding authorized by law"; "[a]ny oral statement made, or written

24

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY
PENALTY - 17

statement or other document submitted, in a place open to the public or a public forum in

connection with an issue of public concern"; or "[a]ny other lawful conduct in furtherance of the

exercise of the constitutional right of free speech in connection with an issue of public concern,

or in furtherance of the exercise of the constitutional right of petition." RCW 4.24.525.  Thus,

Defendants must show that the Board meeting was either a governmental proceeding, or a public

forum and that Shoemaker and Van Bramer's complaint about excessive noise and traffic in their

cul-de-sac is a matter of public concern.  Defendants point to no authority stretching the

governmental proceeding, public forum, or public concern elements to reach the dispute

illustrated here.  Sterling Park contains roughly 120 residents. Dkt. # 10, p. 1. The SPHA

meetings were held in neighbor's private homes. *See id.* at ¶ 4.2.3.  The recorded minutes from

one Board meeting suggest that only a handful of residents attended the meeting where the

neighbors' complaint was first addressed. *See id.*  Moreover, Ms. Fielder lives in a cul-de-sac

within the private community of Sterling Park. *Id.* at 4.1.11.  Defendants' bald assertions that the

SPHA is a government-like entity with official proceedings, that a small meeting in private home

is a public forum, and that traffic congestion and daycares are matters of public concern do not

satisfy the requirements imposed by the statute.  In light of the multiple deficiencies in

Defendants' motion, Defendants failed to meet their threshold burden.  For this reason, the Court

need not address whether Plaintiff can show a likelihood of success on the merits.

4.   Attorney Fees and Statutory Penalty

Plaintiff contends that because Defendants' special motion to strike was frivolous, she is

entitled to the anti-SLAPP sanction under RCW 4.24.525(6)(b).  Although a close call, to find

the motion frivolous requires that "any reasonable attorney would agree such motion is totally

devoid of merit." *Decker v. U.D. Registry, Inc.,* 105 Cal. App. 4th 1382, 1392, 129 Cal. Rptr. 2d

1   892 (Cal. Ct. App. 2003).  As the Court is unable to say with certainty that the motion is wholly

2   without merit, it declines to award Plaintiff the anti-SLAPP sanction. *See Weiland Sliding Doors*

3   *& Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1039 (S.D. Cal. 2011)

4   (declining to award an anti-SLAPP sanction because the anti-SLAPP motion combined with the

5   motion to dismiss indicated a good-faith effort to dismiss the claims).

6                                     **IV. CONCLUSION**

7          Having reviewed Defendant's motions, the response and reply thereto, the attached

8   declarations and exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

9          (1) Defendants' motion to dismiss (Dkt. # 14) is DENIED.

10         (2) Defendants' motion for attorney fees, costs, and statutory penalty (Dkt. #14) is

11             DENIED.

12         (3) The Clerk is directed to send a copy of the Order to the parties and all counsel of

13             record.

14

15         Dated this 10 day of December 2012.

16

17

18                                         RICARDO S. MARTINEZ

19                                         UNITED STATES DISTRICT JUDGE

20

21

22

23

24