UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ELIZABETH FIELDER

Plaintiff,

v.

STERLING PARK HOMEOWNERS ASSOCIATION ET AL.

Defendants.

CASE NO. C11-1688RSM

ORDER ON MOTION TO DISMISS AND MOTION FOR ATTORNEY FEES, COSTS, AND STATUTORY PENALTY

## I. INTRODUCTION

This matter comes before the Court on individual Defendants Waverly Hagen and Don Shoemaker's motion to dismiss and motion for attorney fees, costs, and statutory penalty. Dkt. # 14. Plaintiff Elizabeth Fielder brought suit against the Sterling Park Homeowners Association ("SPHA") and individual members of the SPHA for violations of the Fair Housing Act (FHA), 42 U.S.C. §§ 1981, 1982, the Washington Law Against Discrimination (WLAD), and state-law torts arising from the SPHA's campaign to close Ms. Fielder's in-home daycare. Defendants Hagen and Shoemaker bring the Rule 12(b)(6) motion to dismiss on the basis that as individual

board members of the SPHA, they are immune from this suit. Defendants also bring a special motion to strike pursuant to Washington's anti-SLAPP statute. The Court heard oral argument on October 31, 2012. For the reasons that follow, the motions are DENIED.

## II. BACKGROUND

Ms. Fielder is one of two African-American residents in the Sterling Park community. She moved into her home in 1997 and opened a daycare in 1998. SPHA's Covenants, Conditions, and Restrictions (CCRs) contained a no-commercial-business clause (Section 3.6). However, in 1993, the Board adopted an "invisibility clause" that permitted "invisible" home-based businesses within Sterling Park. The invisibility clause was not passed by the requisite majority, but the Board adopted the clause as a "guideline" for the Board's use. Dkt. # 10.

Before opening her daycare, Ms. Fielder asked permission from the SPHA's then president, Cathy Lehman. Lehman told Ms. Fielder that there was no problem with her operating a daycare from her house so long as she "didn't paint the house purple, or have broken down cars in front of the house." *Id.* at ¶ 4.1.6. Ms. Fielder received the proper state licensing to open her business and the daycare operated until 2009 without incident. She often cared for the children of families within Sterling Park, including SPHA board members.

By 2009, the state permitted up to twelve children in the daycare. In the fall of 2009 Ms. Fielder had about six children in her daycare from three different families. Ms. Fielder's house is in a cul-de-sac, and parents would generally drop and pick-up children between 7 a.m. and 5:30 p.m. Ms. Fielder often drove the children to and from school in her SUV. In October of 2009, Ms. Fielder cared for three children whose parents worked a "non-regular" shift, with pick-up and drop-off occurring between 4:30 and 9:00 p.m.

**A. The Neighbors' Actions**

In mid-July 2009, Ms. Fielder began caring for Christina Singleton and DeMarco Kelly's child. The parents are African American and Christina is a Muslim. Christina wore a head scarf and non-Western clothing when she went to Ms. Fielder's home to pick up her child. Several neighbors began coming outside their homes to watch Christina. One neighbor approached the car with a notepad and paper and appeared to be writing down information about the couple and their vehicle. This behavior eventually extended to other of Ms. Fielder's clients. Ms. Van Bramer and Mr. Shoemaker were often seen congregating and staring; blocking access to the cul-de-sac and forcing clients to drive around them; photographing the clients and children; and yelling baseless complaints at clients including to "turn off the radio" when the radio was not in fact on. Ms. Van Bramer accused a parent of leaving a child in the car while it was running; Ms. Fielder witnessed Van Bramer yelling "fuck off" while vulgarly gesturing. Ms. Van Bramer and Ms. Hagen's sons hit golf balls at Ms. Fielder's home. Ms. Singleton and Mr. Kelly stopped using Ms. Fielder's daycare because of the harassing behavior of the neighbors.

**B. The Board's Actions**

On October 19, 2009, SPHA held its monthly meeting at the home of two Board members, the Warnocks. At the meeting, the Board addressed a "homeowner complaint" about Ms. Fielder's daycare. The complaint alleged excessive noise, twelve children present on any given day and left outside in the summer, a barking dog, traffic and noise from 4:30 a.m. to 10 p.m., speeding cars, and irregular parking. Ms. Fielder was never notified about any such complaint. At a November 30, 2009 board meeting, the Board drafted a letter outlining the concerns. In January of 2010, the Board finalized a letter and sent it to three home businesses within Sterling Park. Letters were sent to Ms. Fielder, another home with a daycare (Ms. Ronning), and a home with a salon (Ms. Atkins). The January 31, 2010 letter was the first time

that Ms. Fielder was apprised of any complaints against her daycare. This letter requested information about the operation of each business. It directed the recipients to review the language of Section 3.6 of the CCRs and the "invisibility clause."

On February 5, 2010, Ms. Fielder sent a notice to her clients reiterating that clients must obey traffic rules and be courteous about noise. Ms. Fielder wrote a responsive letter to Ms. Hagen addressing the Board's concerns. She offered to share her business records and "to work with the board with the expectation that [she] be treated fairly." Dkt. # 10, ¶ 4.2.17. She attempted to give the letter to Ms. Hagen at her home. Ms. Hagen escorted Ms. Fielder off her property and onto the sidewalk before accepting the letter.

The other daycare operator responded to the Board on February 12, 2010, that she provided occasional daycare and had family and friends visit between the hours of 9-4. The salon operator replied, on some unknown date, that she worked two to three days per week, with 9-5 hours, and that she saw about five to eight people per day during the week and fewer on Saturdays. On April 5, 2010, the Board sent a letter of non-compliance to Ms. Fielder only.

Ms. Fielder's son, Leon Richardson, attended an April 22, 2010 Board meeting to discuss the complaints against Ms. Fielder's business. Mr. Richardson made the point that the complaints were unfounded, and requested information about how the Board defined the invisibility clause. The Board stated that it would disregard all of the complaints aside from the excess traffic; however, it provided no guidance on how to interpret the invisibility clause. After the meeting, Mr. Richardson sent an email to Ms. Hagen describing the hours and number of vehicles per day. He wrote that between 6 and 10 a.m. there could be anywhere from four to six vehicles, and the same between 2:15 and 7 p.m. Ms. Fielder attended the next Board meeting in May to discuss the complaints. The complainants were identified as Ms. Van Bramer and Mr.

Shoemaker. The Board suggested that Ms. Fielder talk to the complainants to resolve the issue. Ultimately, the complainants refused to speak with Ms. Fielder and she received a letter on June 7, 2010, directing her to close her daycare.

One month later, Ms. Fielder filed a complaint with the Department of Housing and Urban Development ("HUD") and the Washington State Human Rights Commission ("HRC"). In February 2011, she withdrew the HRC complaint and re-filed it with the King County Office of Human Rights ("OCR"). OCR notified SPHA that at least ten registered businesses were operating from homes within Sterling Park. OCR ultimately issued a finding of cause as to racial discrimination based on disparate treatment.

On May 26, 2011, The Board sent the following email to the other daycare operator, Ms. Ronning:

> You may or may not be aware that the SPHA Board has requested a homeowner who is operating a business out of a home in Sterling Park to either close the business or relocate it out of the neighborhood. . . . The homeowner subsequently filed a fair housing complaint with HUD . . . against the Sterling Park Homeowners' Association claiming that the Board selectively enforced the CC&R by only requesting one business to close and allowing others to continue operating. The investigation is due to conclude very soon. Our lawyer has advised us that, since the intent of our CC&R is clear (i.e. no business of any kind under any circumstances regardless of any "invisibility" interpretation), we must immediately send similar requests to close to any other businesses believed to be operating in Sterling Park. As such, you will be receiving a letter from the SPHA Board stating you are believed to be not in compliance with CC&R 3.6 pertaining to business in the home. We are sending this advance notice as a courtesy to you.

Dkt. # 10, ¶ 4.2.40. Letters to Ronning and Atkins were sent the following day stating that their properties were not in compliance. The letters did not say that the businesses must be immediately closed or relocated.

On October 10, 2011, the Board announced that members voted to change the CCRs to permit businesses under Section 3.6 with certain limitations. Subsection (h) requires that "The business must not include more than four persons per day coming to the subject property for goods or services with hours of operation limited from 7 a.m. to 6 p.m." *Id.* at ¶ 4.2.44. Under the new CCR provision, Ms. Fielder is still not in compliance and the SPHA maintains that she must close or relocate.

## III. ANALYSIS

### A. Motion to Dismiss

In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has alleged sufficient facts to state a claim for relief which is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. 556). In making this assessment, the Court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party. *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted); *Fajardo v. County of Los Angeles*, 179 F.3d 698, 699 (9th Cir.1999). The Court is not, however, bound to accept the plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678. While detailed factual allegations are not necessary, the plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Defendants contend that Shoemaker and Hagen are shielded from personal liability under the Washington Nonprofit Corporation Act (RCW 4.24.264), are protected under the Business

Judgment Rule ("BJR"), and that plaintiff cannot reach defendants through piercing the corporate veil or for *ultra vires* acts. Plaintiff responds that her federal claims preempt application of the Washington statute and that she has pled sufficient facts to support individual liability for civil rights and housing discrimination claims.[1]

1. Director Immunity

Plaintiff asserts federal claims for violations of 28 U.S.C. §§ 1981 and 1982, and the FHA. Defendants contend that Shoemaker and Hagen are immune from individual liability as directors of the SPHA.[2] For such claims, courts have found that directors who participate in, authorize, or ratify the commission of a civil rights or fair housing tort may be held individually liable. *See Smith v. Setchel*, 510 F.2d 1162, 1163 (9th Cir. 1975) (reinstating §§ 1981, 1982, and FHA § 3617 claims against the corporate entity and two individuals—the apartment complex owner and his employee); *Tillman v. Wheaton-Haven Recreation Assoc.*, 517 F.2d 1141, 1146 (4th Cir. 1975) (finding directors of a non-profit swimming pool association could be held personally liable if they intentionally caused the corporation "to infringe the rights secured by § 1981"). To successfully plead a §§ 1981 or 1982 claim against individual directors, a plaintiff must allege that the directors were personally involved in the discrimination. *See Bruin v. Mills College*, 2007 WL 419783, * 3-4 (N.D. Cal. Feb. 6, 2007). For an FHA violation, at least one court has held that a claim may be maintained against individual directors even where

---

[1] Defendants' motion to dismiss argued for dismissal based only on directorship immunity. Although other grounds for dismissal were improperly argued in the Reply brief and at oral argument, the Court considers only the directorship liability arguments made in Defendants' motion.

[2] Defendants brought the motion on the basis that both Shoemaker and Hagen are directors of the SPHA's board. Defendants later stated that Mr. Shoemaker is not a director, but merely a member at large. Again, the Court considers only director immunity as the basis for considering Defendants' motion to dismiss and leaves the factual issue of Shoemaker's SPHA responsibilities for the parties to address at a later time.

defendants' acts lack discriminatory intent. *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347, 1365 (D. Haw. 1995) ("a corporation's officers and directors may be held individually liable for their failure to ensure the corporation's compliance. . . . This is so even where the individual director or officer did not actively participate in the alleged discrimination and did not subjectively intend to discriminate against the complainant.") (internal citations omitted). As discussed below, Plaintiff pleads facts sufficient to infer that both Hagen and Shoemaker were personally involved in the alleged discrimination and that they acted with discriminatory intent.

       Plaintiff also asserts claims under the WLAD and for state-law torts including tortious interference with a business. The SPHA is a nonprofit Washington corporation. Under RCW 4.24.264(1), directors of a nonprofit corporation cannot be held individually liable for discretionary decisions unless the decision constitutes gross negligence. Gross negligence is defined as a "failure to exercise slight care." WPI 10.07. Whether Defendants can be held individually liable depends on whether the Board's disparate enforcement of the CCRs against Ms. Fielder amounts to gross negligence.

       Corporations are entitled to a strong presumption that directors are acting in the best interest of the corporation. But the plain language of RCW 4.24.264(1) is clear: if a Director's decision constitutes gross negligence, the Director can be held personally liable. Only one Washington case discusses individual liability under RCW 4.24.264. In *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wn.2d 380 (2010), the Washington Supreme Court briefly addressed nonprofit directorship liability. It found that directors may be individually liable for torts where the degree of care exercised is substantially greater than ordinary negligence. *Id.* at 401. Because there is limited analysis for nonprofit directorship liability in Washington,

Defendants contend that the Business Judgment Rule provides additional support to insulate Defendants from liability.

The BJR presumes that corporate officers are acting in the best interest of the corporation. The Rule "immunizes management from liability in a corporate transaction undertaken within both the power of the corporation and the authority of management where there is a reasonable basis to indicate that the transaction was made in good faith." *Schwarzmann v. Ass'n of Apartment Owners of Bridgehaven*, 33 Wash. App. 397, 402, 655 P.2d 1177, 1180 (1982). Courts are reluctant to substitute judgment for that of corporate directors. *Id.* But directors are not immunized from liability when they fail to exercise proper care, skill, and diligence. *Shinn v. Thrust IV, Inc.*, 56 Wash. App. 827, 834-35, 786 P.2d 285, 290 (1990).

The Court finds Defendants' director immunity arguments without merit. For her federal claims, Plaintiff alleges facts sufficient to infer that the board members (1) disparately enforced the CCRs, (2) intentionally discriminated against Ms. Fiedler based on race, and (3) were personally involved in the disparate enforcement. Similarly, for her state claims, the facts alleged are sufficient to infer that the board members acted with gross negligence and improper motive.

First, Ms. Fielder alleges facts that show that the SPHA enforced the CCRs disparately against her. Ms. Fielder was asked to close or relocate while no other business received that treatment. The Board cited the "invisibility clause" as the basis for disparate enforcement, but the Board never articulated any standards by which the clause could be interpreted, nor was the clause ever passed as a valid amendment to the CCR. Moreover, the Board permitted Ms. Fielder's daycare for almost twelve years without incident. Thus, it appears the CCRs were disparately enforced.

Second, Ms. Fielder alleges facts that permit an inference of intentional discrimination against her. Although Ms. Fielder alleges that Ms. Singleton's presence at her home triggered the cascade of events and that the neighbors began harassing behavior because of Ms. Singleton's racial and religious status, the complaint asserts that neighbors harassed Ms. Fielder's clients, refused to discuss complaints with Ms. Fielder personally, and targeted her business while permitting numerous other businesses run by white community members. Additionally, the OCR independently found that there was reasonable cause to believe the SPHA engaged in an unfair housing practice due to Ms. Fielder's race. Dkt. # 10, ¶ 4.2.42. Even if Ms. Singleton's presence triggered the neighbors' conduct, there are probative facts pleaded in the complaint that permit an inference of intentional discrimination against Ms. Fielder.

Third, as for Hagen and Shoemaker's personal involvement, Ms. Fielder states that Ms. Hagen was the president of the SPHA; that she signed and sent the letter to Ms. Fielder demanding the closure or relocation of the daycare because of a violation of the CCRs; that she refused to allow Ms. Fielder onto her property when Ms. Fielder attempted to give her a letter; and that she permitted other white businesses to persist, relying only on the say so of those business owners about customer density and traffic. Likewise, Ms. Fielder alleges that Shoemaker was a member of the Board, harassed her daycare clients, and complained to the Board about her business. Plaintiff's allegations show that both Hagen and Shoemaker were personally involved in the disparate treatment.

Taking Plaintiff's allegations as true, the Court has no trouble finding that the board member's actions could constitute gross negligence. For example, violations of the WLAD can never be made in good faith. RCW 49.60.010 ("discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free

democratic state"). Additionally, the BJR is not absolute defense to unlawful discrimination. *E.E.O.C. v. Yenkin–Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir.1997) ("Although it is true that a factfinder should refrain from probing an employer's business judgment, a decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision."). Acts of purposeful discrimination go well beyond ordinary negligence. It may be the case that the Plaintiff will be unable to demonstrate purposeful discrimination after discovery, but she has at least alleged a plausible inference that the Board disparately enforced the CCRs against her based on her race.

Defendants cite *Schwarzmann* for support that the BJR insulates the individual board members from liability. *Schwarzmann* concerned condo owners with a leaky ceiling. 33 Wash. App. at 399. The plaintiffs complained to the condo association board, which failed to provide sufficient corrective action. *Id.* at 400. Plaintiffs filed suit against the board and its individual members. *Id.* The appellate court upheld dismissal of the individual board members, stating that the board member's acts fell within the BJR. *Id.* at 401. It noted that absent evidence of bad faith or improper motive, the court cannot second-guess actions taken by individual members acting on behalf of the corporation. *Id.* at 403.

*Schwarzmann* is inapposite. Plaintiff alleges rights violations derived from race-based disparate treatment. Plaintiffs' allegations against the board members are quintessentially based upon improper motive. Moreover, plaintiffs may challenge whether business decisions "were so infected with error that defendant could not have honestly relied upon it." *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 627 (6th Cir. 2006). Here, plaintiff pleads facts probative of pretext. Besides the events leading up to the Board's demand that Ms. Fielder close or relocate, the Board sent the "courtesy letter" to other home businesses, as instructed by SPHA's lawyer after Ms.

Fielder filed her HUD complaint. That letter at least suggests that the Board's decision to enforce the CCRs against only Ms. Fielder lacked legitimacy. Thus, because plaintiff alleges sufficient factual allegations in the complaint to support keeping Mr. Shoemaker and Ms. Hagen in the suit for both the federal and state claims, the Court denies the 12(b)(6) motion.[3]

**B. Motion for Attorney Fees, Costs, and Statutory Penalty**

Within the motion to dismiss, Defendants brought a motion for attorney fees, costs, and statutory penalty against Plaintiff. They contend that to the extent Plaintiff seeks to hold Mr. Shoemaker personally liable, her complaint runs afoul of Washington's anti-SLAPP statutes.

The Washington anti-SLAPP Act is intended to address lawsuits brought primarily to chill the valid exercise of the constitutional rights of free speech and petition for redress. The legislature found that it is in the public interest for citizens to participate in matters of public concern, and to provide information on public issues that affect them without fear of reprisal through abuse of the judicial process. RCW 4.24.525; Senate Bill 6395, Laws of 2010, Ch. 118 § 1.

The law provides, in relevant part, that "[a] party may bring a special motion to strike any claim that is based on an action involving public participation" as defined in the statute. RCW 4.24.525(a). The section applies to "any claim, however characterized, that is based on an action involving public participation and petition." RCW 4.24.525(2). An action involving public participation includes "[a]ny oral statement made . . . in a place open to the public or a public forum in connection with an issue of public concern . . ." RCW 4.24.525(2)(d) and (e).

---

[3] Because the Court rejects Defendants' argument for director immunity based on the pleading standard for federal civil rights claims, RCW 4.24.264, and the Business Judgment Rule, it finds discussion of the piercing the corporate veil and ultra vires doctrines unnecessary.

The anti-SLAPP law provides relief to a defendant which is in the nature of immunity from suit. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (addressing California's anti-SLAPP statute). In passing the law, the Washington legislature noted concern regarding both the chilling effect on the valid exercise of the constitutional right of freedom of speech, and the chilling effect of "the costs associated with defending such suits." RCW 4.24.525, notes 2010 Ch. 118. The statute accordingly provides for an award of attorney's fees and costs, plus a statutory award of $10,000.00, to a defendant who prevails on an anti-SLAPP motion. RCW 4.24.525(6)(a)(i) and (ii). Conversely, if the court finds that the anti-SLAPP motion to strike was frivolous or brought solely to cause unnecessary delay, then costs, attorney's fees, and $10,000.00 shall be awarded to the plaintiff. RCW 4.24.525(6)(b)(i) and (ii). Therefore, the special motion is not without risk to the moving party.

To prevail on a special motion to strike, the defendant must show by a preponderance of the evidence that the plaintiff's claim is based on an action of public participation and petition. RCW 4.24.525(4)(b). If this burden is met, the burden shifts to the plaintiff to establish by clear and convincing evidence, a probability of prevailing on the claim. *Id.* Here, Shoemaker argues that to the extent Plaintiff seeks to impose personal liability, Plaintiff's claims against him are improperly based on his comments to the SPHA and his acts to "gather evidence . . . in order to report it to the proper authority." Dkt. # 14, p. 15. He contends such acts and comments are actions of public participation within the meaning of the statute and that the complaint seeks to chill his protected First Amendment rights.

Plaintiff opposes the motion on five grounds: (1) the motion to strike is untimely, (2) as to the federal claims, the defendant's motion is preempted, (3) Plaintiff's first amendment rights under the *Noerr Pennington* doctrine insulate plaintiff from liability imposed by the statute, (4)

Defendants fail to meet the statutory criteria, and (5) Plaintiff offers clear and convincing evidence demonstrating a prima facie case. Although Defendants' motion suffers from several defects, the Court addresses Plaintiff's arguments for timeliness, preemption, and failure to meet the statutory criteria. As discussion of those arguments is dispositive, the Court declines to address Plaintiff's formulation of the *Noerr Pennington* doctrine.

1. Timeliness

RCW 4.24.525(5)(a) provides that "[t]he special motion to strike may be filed within sixty days of the service of the most recent complaint or, in the court's discretion, at any later time upon terms it deems proper." Plaintiff filed her amended complaint on October 25, 2011. Defendants brought the special motion to strike on March 5, 2012, much later than the sixty day service requirement without leave of the Court. Defendants offered no particular reason why the motion was untimely, but directed the Court to case law where courts permitted late filing, particularly in cases where discovery has yet to begin. *See Phoenix Trading, Inc.*, 2011 WL 3158416 * 6 (W.D. Wash. July 25, 2011) (noting that the language of RCW 4.24.525(5)(a) is permissive). Despite Defendants' noticeable lack of excuse as to timeliness, the Court declines to decide the motion on a purely procedural deficiency.

2. Preemption

Defendants generically attack Plaintiff's claims without specifying the particular claims to which the anti-SLAPP statute applies. Plaintiff correctly argues that anti-SLAPP statutes are not applicable to federal claims. In the Ninth Circuit, federal preemption is well established in the anti-SLAPP context. For example, in *Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*, 448 F. Supp. 2d 1172 (C.D. Cal. 2006), the court thoroughly discussed federal preemption of California's anti-SLAPP statute and found the statute inapplicable to federal claims. The court noted that "California has no interest in dictating rules of procedure or substance applicable to

federal claims brought in federal court."[4] *Id.* at 1182; *see also In re Bah*, 321 B.R. 41, 46 (9th Cir. BAP 2005) (agreeing that the "anti-SLAPP statute may not be applied to matters involving federal questions"). Defendants offer no substantive challenge to the argument that the Supremacy Clause preempts application of Washington's anti-SLAPP statute to Plaintiffs' §§ 1981, 1982, and FHA claims. Accordingly the motion is denied for Plaintiff's federal claims.

3. Merits of Defendants' Motion

In bringing the special motion to strike under the anti-SLAPP statute, Defendants must show, by a preponderance of the evidence, that *the claim* is based on an action involving public participation and petition. *Phoenix Trading, Inc. v. Kayser*, 2011 WL 3158416 * 5 (W.D. Wash. July 25, 2011) (emphasis added). When evaluating whether the moving party meets its threshold burden, courts look to the "principle thrust or gravamen of the plaintiff's cause of action." *Bautista v. Hunt & Henriques*, C-11-4010 JCS, 2012 WL 160252 (N.D. Cal. Jan. 17, 2012) (quoting *Martinez v. Metabolife Internat. Inc.*, 113 Cal. App. 4th 181, 187, 6 Cal. Rptr. 3d 494 (2003)). In addition, the moving party must demonstrate that "the actual acts underlying each claim at issue were acts taken [by the defendant] in furtherance of the right to petition and free speech." *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1017 (N.D. Cal. 2007). If a court denies an anti-SLAPP motion, it has merely found that the plaintiff's claims may have merit; the court does not evaluate whether plaintiff's claim will succeed. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).

---

[4] The Court looked to relevant California case law in instances where Washington law remains limited on a number of issues. Because Washington's new anti-SLAPP statute mirrors California's Anti-SLAPP Act, this Court has previously cited to California case law for persuasive authority. *See Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1110 (W.D. Wash. 2010).

Here, Plaintiff asserts a state law claim for tortuous interference with a business.[5] Dkt. # 10, ¶ 5.3. As noted above, Defendants failed to articulate why any of plaintiff's individual claims are based on an action involving public participation and petition. Instead, they assert generally that, as to all claims, Plaintiff's complaint is impermissibly based on Shoemaker's statements to the SPHA. Defendants' motion is devoid of any particular discussion about how Plaintiff's tortious inference claim is based on Shoemaker's comments. It is Defendants' burden to show first that each claim is based on an action involving public participation and they have failed to do so here. *See Sonoma Foods, Inc.*, 634 F. Supp. 2d at 1017 (denying an anti-SLAPP motion where it generally targeted the complaint as a whole). But even if Defendants had offered support for why the anti-SLAPP statute applies to Plaintiff's discrete claims, the motion still fails to show that the gravamen of Plaintiff's complaint targets Shoemaker's actions or that Shoemaker's actions are protected acts of public participation under the statute.

First, Plaintiff's complaint provides detailed factual allegations of disparate treatment and harassment by her neighbors. Although Shoemaker and Van Bramer's initial neighbor complaint to the SPHA Board may have precipitated the Board's consideration of Ms. Fielder's business, the statement by Shoemaker hardly encompasses the thrust of Plaintiff's allegations against him. Plaintiff alleges that Shoemaker blocked her client's entry and exit, stood around and laughed while clients dropped their children off, yelled baseless complaints at clients as they drove in and out of the cul-de-sac, and wrote down information about clients and their vehicles. Plaintiff also

[5] It is unclear from the Amended Complaint whether Plaintiff alleges any additional state law causes of action. To the extent she does, the analysis applies equally to any additional claims as Defendants have not shown that each claim is independently based on Shoemaker's right of public participation.

alleges that she lost clients because they no longer felt comfortable dropping their children off due to her neighbors' actions.

"[C]ourts evaluating a special motion to strike . . . must carefully consider whether the moving party's conduct falls within the "heartland" of First Amendment activities." *Jones v. City of Yakima Police Dept.*, 12-CV-3005-TOR, 2012 WL 1899228 (E.D. Wash. May 24, 2012). The conduct alleged in the complaint predominately describes unprotected activity. The First Amendment does not protect neighbors from acting badly to each other. Assuming for the moment that Shoemaker's comments to the board were protected speech, the complaint as a whole targets Shoemaker's actions more broadly. "When the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." *Martinez v. Metabolife Internat. Inc.*, 113 Cal. App. 4th 181, 187, 6 Cal. Rptr. 3d 494 (2003). Defendants contend that Shoemaker's actions were investigative activities and liken Shoemaker's conduct to a person who does "nothing more than detail his version of the facts to a police agency and asks the agency for assistance . . . ." Dkt. # 14, p. 14. However, such a construction of the facts is improper. Taking Plaintiff's allegation in the light most favorable to her, as the Court must, the claims only tangentially implicate Mr. Shoemaker's comments to the Board and the complaint does not target protected activity as intended by the statute.

Second, Defendants also fail to demonstrate that Shoemaker's comments to the SPHA fall under the protection of the anti-SLAPP statute as acts of public participation. Under subsections (a), (d), and (e), an act of public participation includes "[a]ny oral statement made, or written statement or other document submitted, in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law"; "[a]ny oral statement made, or written

statement or other document submitted, in a place open to the public or a public forum in connection with an issue of public concern"; or "[a]ny other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public concern, or in furtherance of the exercise of the constitutional right of petition." RCW 4.24.525. Thus, Defendants must show that the Board meeting was either a governmental proceeding, or a public forum and that Shoemaker and Van Bramer's complaint about excessive noise and traffic in their cul-de-sac is a matter of public concern. Defendants point to no authority stretching the governmental proceeding, public forum, or public concern elements to reach the dispute illustrated here. Sterling Park contains roughly 120 residents. Dkt. # 10, p. 1. The SPHA meetings were held in neighbor's private homes. *See id.* at ¶ 4.2.3. The recorded minutes from one Board meeting suggest that only a handful of residents attended the meeting where the neighbors' complaint was first addressed. *See id.* Moreover, Ms. Fielder lives in a cul-de-sac within the private community of Sterling Park. *Id.* at 4.1.11. Defendants' bald assertions that the SPHA is a government-like entity with official proceedings, that a small meeting in private home is a public forum, and that traffic congestion and daycares are matters of public concern do not satisfy the requirements imposed by the statute. In light of the multiple deficiencies in Defendants' motion, Defendants failed to meet their threshold burden. For this reason, the Court need not address whether Plaintiff can show a likelihood of success on the merits.

4. Attorney Fees and Statutory Penalty

Plaintiff contends that because Defendants' special motion to strike was frivolous, she is entitled to the anti-SLAPP sanction under RCW 4.24.525(6)(b). Although a close call, to find the motion frivolous requires that "any reasonable attorney would agree such motion is totally devoid of merit." *Decker v. U.D. Registry, Inc.*, 105 Cal. App. 4th 1382, 1392, 129 Cal. Rptr. 2d

892 (Cal. Ct. App. 2003). As the Court is unable to say with certainty that the motion is wholly without merit, it declines to award Plaintiff the anti-SLAPP sanction. *See Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1039 (S.D. Cal. 2011) (declining to award an anti-SLAPP sanction because the anti-SLAPP motion combined with the motion to dismiss indicated a good-faith effort to dismiss the claims).

## IV. CONCLUSION

Having reviewed Defendant's motions, the response and reply thereto, the attached declarations and exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Defendants' motion to dismiss (Dkt. # 14) is DENIED.

(2) Defendants' motion for attorney fees, costs, and statutory penalty (Dkt. #14) is DENIED.

(3) The Clerk is directed to send a copy of the Order to the parties and all counsel of record.

Dated this 10 day of December 2012.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE